Filed 1/9/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GWENDOLYN ADAMS et al., | |
| Plaintiffs and Appellants, | G062782 |
| v. | (Super. Ct. No. CIVDS1831184) |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Bryan Foster, Judge.  Reversed and remanded.

Adamson Ahdoot, Alan A. Ahdoot; Esner, Chang, Boyer & Murphy, Stuart B. Esner, Kathleen K. Becket, and Rowena Dizon for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Pamela J. Holmes, Acting Assistant Attorney General, Elizabeth S. Angres and Mark A. Brown, Deputy Attorneys General, for Defendant and Respondent.

\*          \*          \*

Gwendolyn Adams and Glenn Tyler Bolden (plaintiffs) appeal from the trial court's entry of judgment in favor of the California Department of Corrections and Rehabilitation (CDCR). The adverse judgment ensued following the court's grant of summary judgment against plaintiffs on Bolden's negligence claim and Adams's claims for negligence causing wrongful death, negligence—survival action, assault and battery, and violation of the Tom Bane Civil Rights Act (Civ. Code, § 52.1).

Plaintiffs alleged Bolden and Adams's son, D'son Woods, were severely injured after being forced off the freeway in a high-speed chase by a peace officer employed by the CDCR, Michael William Becker, who pursued them to investigate his unfounded suspicions of wrongdoing. CDCR obtained summary judgment on grounds that Becker, as a matter of law, could not be found to have been acting within the course and scope of his employment at any time during the pursuit.[1] Because determining whether an employee has acted within the scope of employment is "'[o]rdinarily,'" a question of fact rather than an issue of law (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1019 (*Farmers*)), we must reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In the early morning hours of August 1, 2018, Becker began his commute in Yucaipa, during which he "normally" would have continued westbound on Interstate 10 past the interchange with the 215 freeway, on his way to work at the California Institute for Men (CIM) in Chino. Becker was employed at CIM as, by his own description, "a peace officer" for the CDCR.

Becker's shift that day was scheduled to begin at 4:00 a.m. He went to work wearing his CDCR uniform, consisting of green pants and a tan or green shirt with his badge and name tag on his chest, and CDCR credentials on his shoulder. Becker

_____

[1] Causes of action against Becker are not the subject of this appeal.

2

testified that, while his shirt indicated he was a correctional or peace officer, his pants and the personal jacket he wore over his shirt did not.

Becker testified he carried an off-duty firearm on his person "being that we would wear our uniforms to and from work." He testified that when he wore his uniform, he generally made sure to be "more aware" of his surroundings. Becker testified his .40 caliber Glock semi-automatic handgun was not issued by CDCR. His supervisor acknowledged Becker was legally authorized to carry the handgun when he was not on duty because, "as peace officers, we're allowed to carry off duty . . . that's where we get our authority from to carry off duty."

Property surveillance footage showed that Becker stopped to get gas around 3:11 a.m. at an "AM/PM" station near the I-10 onramp in Yucaipa as he began his commute. Woods and Bolden stopped at the same station for Woods to purchase cigarettes on their way "to get something to eat" at an all-night restaurant. Becker went inside the convenience store at the station to buy coffee and, as reflected in a responding officer's subsequent traffic collision report, "[w]hile in the store, he observed a black male (Party No. 2, Woods) that looked suspicious [to Becker] and [Becker] kept an eye on him." At his subsequent deposition, Becker was unable to recall "what it was about Mr. Woods that [he] felt was suspicious."

Woods and Becker returned to their respective vehicles, with Woods entering the driver's seat of his vehicle to rejoin Bolden. According to Becker, as Woods drove past his vehicle at the pump, Woods "shouted several derogatory comments before leaving the gas station."

Becker exited the gas station in the same direction he saw Woods and Bolden depart, and he caught up to them on the I-10 freeway headed westbound. Bolden saw Becker advancing on them at a high rate of speed; according to Becker, Woods was "driving at a much slower speed than freeway traffic." It is not clear from the record whether there was any contact between the two vehicles at this point; however, the

3

CDCR's summary judgment papers alleged "Becker followed [Woods's] vehicle to get identifying information because [Woods's] vehicle had damaged his vehicle." Plaintiffs disputed this.

In any event, when Becker pulled alongside Woods and Bolden, Bolden recalled Becker illuminated the dome light inside his vehicle and was "pointing something at them." In Bolden's statement to a California Highway Patrol (CHP) officer, he described the object "as being black with a grip," and said he believed "it was a gun."

Bolden told Woods it "was the same car they saw at the AM/PM"; he told the CHP investigator he "kn[ew] this because he noticed the same uniform and the same car." Bolden said he "did not know what kind of officer Mr. Becker was, he just knew he was an officer in some capacity."

Bolden recalled Becker "passing their car and slamming [on] the brakes, then catching back up to speed with their vehicle again." Woods sped up, according to Bolden, "in an attempt to create space between them and calm the situation." At various times, both vehicles accelerated to high rates of speed. Bolden, in Woods's Lexus, estimated speeds up to 100 miles per hour, while Becker, in a Nissan Altima, estimated speeds up to 120 miles per hour.

Becker deviated from his ordinary commute to continue to pursue Woods. He acknowledged he "could have continued . . . on his way to work but decided to follow Woods because he didn't have his license plate and information." Becker thus "diverted from his normal route," instead "opt[ing] to follow [Woods from] I-10 westbound to I-215 southbound."

It was undisputed that during the pursuit Becker "pull[ed] his firearm out of his pocket in the hopes that Woods and Bolden would see it." The CDCR claimed that fact was "immaterial." According to Becker, he was "purs[u]ing Woods['s] vehicle to investigate it or identify it for the purpose of turning it in to the proper authorities and to

4

get Woods apprehended." Becker admitted his actions may have been a "work thing that kicked in," in that he "was not going to let a bad guy get away . . . ."

Bolden claimed he and Woods saw the gun when Becker initially pulled alongside them. Bolden recalled that Becker "lift[ed] his arm pointing something black at him and Woods from his car," which "caused both Bolden and Woods to 'freak out.'"

As the vehicles made the transition from I-10 westbound to I-215 southbound at a high rate of speed, an accident occurred. Bolden, who suffered a head injury in the accident, could "provide no details of the collision" to the officer who responded to the scene, other than that he "last recalled traveling at 100 mph." Becker did not disclose to the responding officer he drew or displayed his weapon, nor did he claim Woods had damaged his car or suggest that he was pursuing Woods to obtain his license plate number or other information to turn over to other authorities.

The collision proved catastrophic for Woods and Bolden. The officer's report summarized that, following the impact with Becker's vehicle, their car (V-2) "left the roadway to the right and went down the embankment. V-2 collided with a light pole, knocking it down. V-2 continued down the embankment rolling over and collided with a tree where it came to rest on its left side. After the collision, P-1 [Becker] drove his vehicle to the gore point . . . separating the transition road and I-215 southbound. P-3 fled the scene in V-3. P-2 [Woods] became incapacitated while V-2 caught fire. P-2's passenger [Bolden] self-extricated and sat on the right shoulder. CHP arrived at the scene and extricated P-2 while V-2 was engulfed in flames."

The officer's report put the time of the accident at 3:28 a.m. on August 1, 2018, approximately 15 minutes after the surveillance footage showed both vehicles at the gas station earlier. After the accident, Becker was charged with a felony count of reckless driving causing bodily injury (Veh. Code, § 23103, subd. (a)), two felony counts of "Exhibiting or drawing a firearm in the presence of a motor vehicle occupant" (Pen.

5

Code, § 417.3), and one misdemeanor count of reckless driving (Veh. Code, § 23103, subd. (a)).

Becker remained employed at the CDCR at least through November 2018, according to his supervisor. The supervisor was aware of the August accident from news reports, but he did not discuss it with Becker, nor did he initiate "any type of follow-up investigation." The supervisor was "not part of any decision to either keep [Becker] at the Department or let him go following the accident," and did not indicate such an inquiry was undertaken.

According to the complaint, Woods suffered "catastrophic injuries and severe burns" in the accident, "ultimately succumbing" to them "more than [a] year" later, in March 2020.

At the outset of the hearing on CDCR's motion for summary judgment, the trial court indicated it "may be a jury question" on "whether or not [Becker] was acting under the color of his position at the time the incident occurred rather than acting on his own motivation." The court observed "it appears from the documents submitted at least there's a triable issue as to whether or not [Becker] was acting as a law enforcement official in his capacity to try to stop the vehicle which he thought was—I'm a little unsure exactly the rationale behind it, but my understanding is he thought the vehicle was involved in criminal activity and undertook actions to try to stop the vehicle."

At the close of the hearing, the trial court took the matter under submission to "give it a second look," and subsequently entered a minute order summarily granting CDCR's summary judgment motion. Plaintiffs now appeal.

## DISCUSSION

A. *Governing Summary Judgment Principles*

"[A]ny party to an action, whether plaintiff or defendant, 'may move' the court 'for summary judgment' in his favor . . . ." (*Aguilar v. Atlantic Richfield Co.*

6

(2001) 25 Cal.4th 826, 843 (*Aguilar*).) A motion for summary judgment must be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc.,[2] § 437c, subd. (c).) "The purpose of summary judgment is not to resolve issues of fact, but rather to determine whether there *are* issues of fact that must be resolved through a trial." (*EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 270.)

"A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the [challenged] cause of action." (*Regents of University of California. v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) A plaintiff opposing summary judgment defeats the motion by showing one or more triable issues of material fact exist as to the challenged element. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

"'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents*, *supra*, 4 Cal.5th at p. 618.) Consequently, "we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group* 400 (2001) 25 Cal.4th 763, 768.)

---

[2] Further undesignated statutory references are generally to the Code of Civil Procedure, although some serial references to other codes within the same paragraph (such as Penal Code sections) are left unspecified where the context is clear.

Section 437c, subdivision (g), requires the trial court in granting a motion for summary judgment to "specifically refer to the evidence proffered in support of and, if applicable, in opposition to the motion that indicates no triable issue exists." Although that statement is absent here, "'"[r]egardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is correct."'" (*California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 631.) The appellate court "'"reviews the trial court's ruling, not its rationale."'" (*Ibid.*)

B. *Applicable Law*

CDCR moved for summary judgment on grounds that, to the extent Becker may have caused injury to Woods or Bolden, he was not acting within the course and scope of his employment at the time.

Government Code section 815.2, subdivision (a), provides for public entity liability "for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment . . . ." The statute codifies for public employers the doctrine of respondeat superior (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932), under which an employer may be vicariously liable for torts committed by its employees. (See, e.g., *Tryer v. Ojai Valley School* (1992) 9 Cal.App.4th 1476, 1480; Civ. Code, § 2338.)

"[T]he central justification for respondeat superior [is] that losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business." (*Farmers*, *supra*, 11 Cal.4th at p. 1004.) The doctrine departs "'from the general tort principle that liability is based on fault.'" (*Perez v. City and County of San Francisco* (2022) 75 Cal.App.5th 826, 833 (*Perez*).)

To impose liability, it is enough that the "actual occurrence" causing injury to a third party "was *a generally foreseeable consequence of the [employer's] activity*." (*Perez*, *supra*, 75 Cal.App.5th at p. 834, original italics.) "'"[F]oreseeability" in this

8

context must be distinguished from "foreseeability" as a test for negligence. In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas "foreseeability" as a test for *respondeat superior* merely means that *in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.'" (*Farmers*, *supra*, 11 Cal.4th at p. 1004.)

At a minimum, principles of respondeat superior require some "connection" between an employee's alleged tort and the employee's work. (*Perry v. County of Fresno* (2013) 215 Cal.App.4th 94, 101.) "For [this] causal nexus to exist 'the incident leading to injury must be an "outgrowth" of the employment [citation]; the risk of tortious injury must be '"inherent in the working environment"' [citation] or '"typical of or broadly incidental to the enterprise [the employer] has undertaken' [citation]."'" (*Id.* at pp. 101-102.)

It is well-established that "vicarious liability is deemed inappropriate where the misconduct does not arise from the conduct of the employer's enterprise but instead arises out of a personal dispute [citation], or is the result of a personal compulsion [citation]. In such cases, the risks are engendered by events unrelated to the employment, so the mere fact that an employee has an opportunity to abuse facilities or authority necessary to the performance of his or her duties does not render the employer vicariously liable." (*Farmers*, *supra*, 11 Cal.4th at p. 1006.)

Nonetheless, "[a]n employee's willful and malicious intentional torts, including those that might contravene an employer's express policies, do not automatically fall outside the scope of employment." (*Daza v. Los Angeles Community College Dist.* (2016) 247 Cal.App.4th 260, 268.) "'"[W]here the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the

9

time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer.""'" (*Farmers*, *supra*, 11 Cal.4th at p. 1004.)

In the end, "[r]espondeat superior is based on '"a deeply rooted sentiment"'" that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208.) "The question of scope of employment is ordinarily one of fact for the jury to determine." (*Id.* at p. 221.)

C.    *Analysis*

Plaintiffs contend the trial court erred in resolving their claims against them as a matter of law. They argue that to the extent the court adopted CDCR's reliance on the workplace "going and coming" exclusion from respondeat superior liability and CDCR's interpretation of the limited scope of Becker's authority as a peace officer under Penal Code section 830.2, it erred. We agree. As we explain, the plaintiffs' claims were not foreclosed as a matter of law; instead, conflicts in the evidence precluded summary judgment.

The parties' central dispute is whether—at the time of Becker's early morning pursuit of Woods and Bolden—he was engaged in law enforcement functions as an "outgrowth" of his employment or whether, as CDCR argues, he engaged for purely personal reasons in a "road rage incident."

Inferences from the record support both possibilities. For example, CDCR cites evidence to support a conclusion Becker's employment did *not* include typical law enforcement functions inside the prison, let alone outside the walls, because he "was assigned to culinary duty at CIM." CDCR argues "[t]he undisputed facts show that Becker was not acting in the course and scope of his employment as a correctional officer at the time of the road rage incident on August 1, 2018, nor is the incident related to CDCR's operation of state prisons."

10

On the other hand, while plaintiffs do not dispute Becker was on culinary duty, it is undisputed he was employed in that capacity as a peace officer.[3] He testified he was a peace officer, and his supervisor agreed. The trier of fact could be persuaded that Becker's high-speed pursuit of plaintiffs was an "outgrowth" of his law enforcement responsibilities based on several factors. For instance, he told the CHP officer shortly after the accident that "he was not sure if it was a work thing that kicked in . . . . 'I was not going to let a bad guy get away from me.'" He also told the investigator that when Woods allegedly insulted him without provocation back at the gas pump ("Fuck you mother fucker, you fucking bitch"), Becker "was not sure if they [i.e., Woods and Bolden] knew him *from work* or from somewhere else." (Italics added.) As a result, the trier of fact could draw an inference that Woods recognized Becker as a peace officer of some sort, even if Woods could not see Becker's entire uniform. The trier of fact could thus infer Becker's decision to pursue Woods after being insulted by him, was to some degree an "outgrowth" of Becker's employment.

As is the case with respondeat superior issues generally, application of the going and coming rule "is usually a question of 'fact for the jury. All of the relevant circumstances must be considered and weighed in relation to one another.'"[4] (*Sumrall v. Modern Alloys, Inc.* (2017) 10 Cal.App.5th 961, 968 (*Sumrall*).) When more than one

---

[3]    The Attorney General acknowledged during oral argument the critical nature of prisoner supervision during food preparation given the presence of potential weapons in a kitchen setting.

[4]    "'An offshoot of the doctrine of respondeat superior is the so-called "going and coming rule." Under this rule, an employee is not regarded as acting within the scope of employment while going to or coming from the workplace. [Citation.] This is based on the concept that the employment relationship is suspended from the time the employee leaves work until he or she returns, since the employee is *not ordinarily rendering services* to the employer while traveling.'" (*Jeewarat v. Warner Bros. Entertainment Inc.* (2009) 177 Cal.App.4th 427, 435, italics added.)

11

reasonable inference can be drawn from the facts, taking the issue from the trier of fact is unwarranted.  (*Ibid.*)  That is the case here.

CDCR's reliance on Penal Code section 830.2 does not change our analysis.  CDCR relies on this section for the proposition that Becker's "peace officer authority did not extend statewide."  But the issue for the trial court's consideration was not the geographic limits of Becker's peace officer authority; the issue was whether or not the trier of fact might reasonably conclude Becker was acting as a law enforcement officer as he pursued and attempted to stop Woods and Bolden.  Penal Code section 836 gave Becker authority to do so, in that it provides that a peace officer has all the powers incident to arrest when "[t]he officer has probable cause to believe that the person to be arrested has committed a public offense in the officer's presence."  (*Id.*, subd. (a)(1).)

Returning to Penal Code section 830.2, in its briefing CDCR seems to suggest that Becker was not a peace officer at all based on his assignment in which he supervised inmates working in the prison kitchen.[5]  But the actual statutory language is this:  "The following persons *are peace officers whose authority extends to any place in the state*:  [¶] . . . [¶] (d)(1) Any member of the Office of Correctional Safety of the Department of Corrections and Rehabilitation, *provided that* the *primary duties of the peace officer* shall be the investigation or apprehension of inmates, wards, parolees, parole violators, or escapees from state institutions, the transportation of those persons, the investigation of any violation of criminal law discovered while performing the usual and authorized duties of employment, and the coordination of those activities with other criminal justice agencies."  (Italics added.)

---

[5]  During oral argument the Attorney General agreed Becker was a peace officer while he was on duty at CIM.

12

CDCR suggests this language means that when he was assigned to supervise culinary activities at CIM, Becker's peace officer authority vanished. We are not persuaded. As noted above, there are few potentially more sensitive areas in a state prison than its kitchens from a security standpoint. Beyond that consideration, we interpret statutory language de novo and, in doing so, presume the Legislature "intended to maintain a consistent body of rules." (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199.)

CDCR overlooks the fact that Penal Code section 830.2's "primary duties" language has been construed by the Attorney General to mean, based on the history of relevant statutory amendments governing peace officer authority, that "the Legislature, by identifying a 'primary duty,' did not intend to confine the peace officer authority of those persons listed in section 830.2 but intended only to specify their paramount duty. If the Legislature had intended otherwise, it could have used the term 'exclusive duty' rather than the term 'primary duty' or [it could otherwise have] limited Branch members' peace officer authority . . . ." (64 Ops.Cal.Atty.Gen. 886 (1981).)

In other words, the Attorney General's opinion reflects that peace officer authority is not limited to an officer's "primary" duties described in Penal Code section 830.2; that authority includes other powers such as those incident to arrest set forth in Penal Code section 836. Section 830.2 does not preclude a jury from concluding that Becker was a peace officer, or that he was acting in his law enforcement capacity when he pursued Woods and Bolden.

Finally, we address CDCR's reliance on Becker's testimony that "what he was doing" was merely "trying to get [Woods's] license plate number . . . to report it to local authorities." This assertion as to "what he was doing" did not resolve *as a matter of law* whether Becker was acting as a private citizen or a law enforcement officer over the course of his encounter with Woods and Becker. "'All of the relevant circumstances must be considered'" on this question. (*Sumrall*, *supra*, 10 Cal.App.5th at p. 968.)

13

The evidence was sharply conflicting on whether Woods or Bolden, or both, saw Becker's uniform and therefore may have believed he acted under color of his authority as a peace officer. According to CDCR's response to plaintiffs' separate statement of facts, Bolden testified at his deposition "that prior to the accident, he did not observe Becker wearing any clothing that indicated he was a peace officer, he never knew Becker was a peace officer and thought he was a 'regular dude.'" CDCR suggests that Bolden's statement to an investigator days after the accident that, while not knowing "what kind of officer Mr. Becker was, he just knew he was an officer in some capacity" can be explained by the fact he reviewed with his mother cell phone video footage taken at the accident scene, which may have shown Becker still in his uniform.

But Bolden had also told Woods in the midst of the pursuit that it "was the same car they saw at the AM/PM," and Bolden told the investigator he "*kn[ew] this* because *he noticed the <u>same uniform</u> and the same car.*" (Italics and underscoring added.) The factual conflict created by this testimony could not be resolved by the trial court as a matter of law in the context of a motion for summary judgment. It was for the trier of fact to resolve whether Woods or Bolden, or both, knew or believed Becker was a peace officer.

## DISPOSITION

The trial court's entry of judgment upon granting CDCR's motion for summary judgment is reversed. The matter is remanded for further proceedings in the trial court. Plaintiffs are entitled to their costs on appeal.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.


15