Filed 9/26/24  Wu v. County of Los Angeles CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| ERICA WU et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF LOS ANGELES et al., <br><br> Defendants and Respondents. | B320175 <br><br> Los Angeles County <br> Super. Ct. No. 19STCV26712 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark H. Epstein, Judge.  Affirmed in part; reversed in part.

Law Offices of Victor L. George, Victor L. George, Meylin P. Alfaro; Esner, Chang & Boyer, Stuart B. Esner, Holly N. Boyer, and Kathleen J. Becket for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Elizabeth S. Angres, Acting Assistant Attorney General, Donna M. Dean and Mark A. Brown,

Deputy Attorneys General for Defendant and Respondent State of California.

Hurrell Cantrall, Thomas C. Hurrell and Melinda Cantrall for Defendants and Respondents County of Los Angeles, Los Angeles County Sheriff's Department, John S. Benedict, Commander Patrick Nelson and Captain Joshua Thai.

---

## INTRODUCTION

On June 22, 2018, Tristan Beaudette and his two young daughters, ages two and four, were camping in Malibu Creek State Park when Beaudette was shot and killed at 4:44 a.m. as he slept in the tent between his two daughters. At the time of the shooting, park employees were aware of other recent shootings in and near the campground, the most recent being four days before Beaudette was killed. No one warned Beaudette or any campers of the recent shootings, despite employees having been warned not to enter that area of the park after dark. Beaudette's spouse, Erica Wu, on behalf of herself and as guardian ad litem for their daughters (plaintiffs), brought an action against the State of California Department of Parks and Recreation, California State Park Police, California State Park and Recreation Commission, and employees of the various entities (the State defendants); the County of Los Angeles, Los Angeles County Sheriff's Department, Division Chief John S. Benedict, Captain Josh Thai, and Commander Patrick Nelson (the County defendants); and the alleged shooter for wrongful death, dangerous condition of public property, wrongful death (negligence), negligent infliction of emotional distress, intentional infliction of emotional distress.

2

The trial court sustained the State and County defendants' demurrers to the operative complaints without leave to amend. The trial court held the State defendants and County defendants owed no duty of care to plaintiffs. We now affirm as to the County defendants and reverse as to the State defendants.

## BACKGROUND

### I.    The Allegations of the Third Amended Complaint

Because judgments were entered upon demurrers, our factual summary is based on allegations in the complaints. We take as true properly pleaded material facts alleged in one or both operative pleadings, disregarding contentions, deductions, and conclusions of law. (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.)

The County defendants' demurrer was sustained without leave to amend as to the Third Amended Complaint. The State defendants' demurrer was sustained without leave to amend as to the Fourth Amended Complaint. We draw the facts stated below from the allegations of the Third Amended Complaint (TAC), filed May 24, 2021. Facts added later in the Fourth Amended Complaint as to the State defendants only are stated in Section IV, below. We do not discuss the second and fifth causes of action for dangerous condition of public property and intentional infliction of emotional distress because the dismissal of those claims has not been challenged on appeal.

The State defendants owned, maintained, and operated Malibu Creek State Park, which has 63 campsites numbered 1-63. On June 21, 2018, Beaudette, his two daughters, his brother-in-law, and his two nephews set up camp at a campsite at Malibu Creek State Park. Beaudette had reserved campsite

3

No. 49 but upon arrival they were reassigned to campsite No. 51 by park staff. No park employee warned them of a series of shootings and prior incidents that had occurred mere feet from campsite No. 51 to which the Beaudette family had been assigned. Beaudette and his daughters slept in one tent and Beaudette's brother-in-law and two nephews slept in a separate tent next to the Beaudette family. At 4:44 a.m. Beaudette was shot. He died where he was sleeping in the tent between his daughters who, awakened by the gunshot, saw their father die as he lay between them.

During the 19 months before Beaudette's murder, the State and County defendants were aware of at least seven to nine unsolved prior shootings at humans and vehicles in and adjacent to the park between November 2016 and Beaudette's death on June 22, 2018. These other shootings included:

- November 3, 2016. James Rogers was shot while sleeping in his hammock around 3:00 a.m. in Tapia Park. After reporting the shooting, a park employee told Rogers "there was a lot of weird activity" in the park and the rangers "had been told not to be there by themselves and not to go there at night."
- November 9, 2016. A camper was sleeping in his trailer vehicle in campsite No. 58 when he heard an explosion outside his trailer at 3:20 a.m. He noticed a hole in the side of his trailer about five inches below the window and a birdshot shotgun round in the side of the trailer. The camper became scared and drove to the entrance of the campsite to report the incident. He also called 911 to report it.

4

- January 7, 2017. Meliss Tatangelo's car was shot at while parked at campsite No. 57. She and Frank Vargas were sleeping in the back of their Honda HR-V when they awoke to a loud sound. Later that morning, Tatangelo discovered a gunshot hole in the back of the car. When she reported the shooting to the police, she was told "That's not our problem. Call the State Parks guys." She was later contacted by the State Park police to whom she explained what happened. She was told, "This doesn't happen out here." The State Park police walked all over everything at the scene, including walking over the dirt and any footprints. The camp host confirmed he awoke to a loud sound early in the morning that originated in the direction of campsite No. 57. A shotgun slug was found in the car and a shotgun wading was located 20 feet from campsite No. 57. No one contacted Tatangelo again.
- March 12, 2017. Kyle Leveque, a seasonal park aide, reported hearing two gunshot rounds fired while he was working at the entrance station to the park.
- Sometime in April 2017. State Parks Peace Officer Dustin E. Lebrun reported hearing gunshots in the early morning hours. Lebrun lived on or near the park premises at the time he heard and reported the gunshots.
- June 8, 2017, at 4:30 a.m. A shooting occurred on Las Virgenes Road adjacent to Malibu Creek State Park in which a Porsche vehicle was struck with birdshot pellets.
- July 22, 2017, in the early morning hours. A BMW was shot at, again on Las Virgenes Road adjacent to the park. The car was hit by birdshot from an elevated position.

5

- July 29, 2017 or July 31, 2017.  Campers at the campsite reported hearing gunfire in the early morning hours.
- On June 18, 2018, four days before Beaudette's shooting.  A Tesla was struck by a bullet at 4:20 a.m., again on Las Virgenes Road adjacent to the park.

Sometime between November 2016 and January 2017, defendant Anthony Rauda (Beaudette's alleged killer) was arrested for the first shootings and released without being charged.  On October 10, 2018, after Beaudette's fatal shooting, Rauda was rearrested.  He is currently charged with Beaudette's murder, 10 counts of attempted murder, and five counts of burglary.

After Beaudette's murder, the State defendants closed the park and did not reopen it until May 2019.  The State defendants installed 24-hour video surveillance through the park with signs warning the "park is under 24-hour video surveillance."  Within a few months of Beaudette's death, 31 cameras were installed in the park and 12 cameras were installed in the subject campground.  The purpose of the video surveillance was to assist in investigating potential violations of state and local statutes and ordinances.  Well in advance of Beaudette's death, the State defendants were on notice and knew of the seven to nine shootings and were aware that there was a prowler or prowlers on the park grounds firing a weapon in the park at or near paying campers, yet the State defendants kept the campground open.

In January 2017, Los Angeles County Sheriff's Detective James Royal became aware of the first three shootings that occurred on November 3, 2016, November 9, 2016 and January 7, 2017.  He advised his supervisors in the Sheriff's Department

6

that the public needed to be warned. No warnings were issued and the detective was told by his supervisors it was a "State Park's problem," not theirs.

Thereafter, four more shootings occurred in the area, two on June 8 and July 22, 2017 on Las Virgenes Road adjacent to the park, one on July 31, 2017 in the campground area, and one on June 18, 2018, again on Las Virgenes Road. Detective Royal again insisted that the Sheriff's Department warn the public about the series of shootings by issuing a public safety statement about them. Again, superior officers at the Sheriff's Department denied the request and no public safety statement was issued. After the third or fourth shooting all State and County defendants knew there was a pattern and the shootings were related.

After the third incident in January 2017, when Tatangelo's car was shot at while she was sleeping in campsite No. 57, state park officers concluded the shootings were deliberate as no other surrounding parks had been targeted. State Parks officers noted there was an old transient camp behind the district office maintenance area. At that point the State of California and County of Los Angeles agreed to cooperate and cross-report to each other information any similar incidents, suspicious persons or other potentially related information in an effort to coordinate information and a response to the shootings. However, the agreed-upon cross-reporting never happened in that the Sheriff's Department failed to disclose similar incidents and accurately inform the State defendants of prior related shootings. Beaudette's murder, the Sheriff's Department stated to the public its official position that the series of shootings were unrelated to the Beaudette murder.

7

## II. **The Causes of Action**

### A. Negligence Against the State Defendants

The first cause of action alleges wrongful death/negligence by the State defendants. These defendants "owned, leased, rented, occupied, possessed, designed, constructed, developed, landscaped, operated, inspected, repaired, maintained, modified, managed, controlled, patrolled and/or supervised Malibu Creek State Park. They and their employees were aware of at least seven to nine unsolved gunshot shootings of humans and vehicles in and adjacent to Malibu Creek State Park between November 2016 and June 22, 2018. The State defendants owed a duty to plaintiffs, as invitees, guests, and paid customers, to "keep the property in a reasonably safe condition and to give adequate warning of anything that could be reasonably expected to harm [Beaudette] and his two young daughters." This duty of care arose by virtue of a "special relationship" beyond what each person generally owes and specifically imposes on the State defendants "the duty to use reasonable measures to protect patrons from foreseeable injury at the hands of third parties acting negligently or intentionally." The special relationship imposed on the State defendants included "an affirmative duty to protect them against unreasonable risk of physical harm." Plaintiffs allege a special relationship that "exists between a possessor of land and a paid invitee and this relationship runs not only to the property owner but its employees and agents." "The special relationship between a property owner, and specifically an innkeeper such as Malibu [Creek] State Park here, and the guest, paid customers using the property . . . places an affirmative duty on the property owner and its employees and agents to take reasonable precautions to protect patrons from

reasonably anticipative criminal conduct of unknown third parties and other such foreseeable harms."

"This duty further included a duty to maintain the premises in a reasonably safe condition by, including, but not limited to, inspecting, supervising, monitoring, controlling, patrolling, and/or otherwise maintaining [Malibu Creek State Park] and protecting persons legally on said property from foreseeable harm, including harm by the serial shooter." Specifically plaintiffs allege the State defendants knew the shooter had repeatedly shot into specific campsites immediately adjacent to where Beaudette and his daughters were camping, knew the shooter had previously attempted to shoot at individuals, and knew the shooter would strike in the early morning and dark hours when it was foreseeable that Beaudette and his daughters would be sleeping in a tent. It was only as "paid patrons of Malibu Creek Park Campground" that Beaudette and his daughters "were able to use the campsite and spend the night, thus placing him in harm's way of the foreseeable shooter in the early morning hours of June 22, 2018."

The State defendants "created the very peril by inviting visitors . . . to its property for a fee to spend the night on its Campground without taking any protective measures or even warning visitors . . . of the serial shooter and the prior incidents occurring mere feet from their campsite." "By selling patrons a campsite for the purpose of sleeping outdoors and unprotected, without any warning of the potential and likely danger posed by the known serial shooter," the State defendants provided Beaudette and plaintiffs "a false sense of security while they sleep outdoors and exposed to the conditions." "As an innkeeper, providing guests with a place to sleep for a fee, the State . . . owed

9

a duty to use utmost care and diligence to protect its patrons staying on the Campground from known and otherwise foreseeable criminal conduct." "In the very least "the State had "a duty to provide a warning adequate to enable paid visitors/invitees to avoid the harm, or otherwise to protect against it, . . . particularly from the harm from the serial shooter known by . . . Defendants to be terrorizing the park for more than a year and a half before [Beaudette] was killed."

This cause of action alleges that the State defendants breached their duty by failing "to provide any safeguards against the known dangers of the active serial shooter or even a warning about the foreseeable dangers posed by the shooter." They were aware of the numerous prior shootings at the park and failed to take reasonable protective measures, including but not limited to, installing 24 hour surveillance cameras, including signs warning of the cameras, installing adequate lights of area around the campsite to protect against non-invitees accessing the campsite, precluding overnight camping at the specific campsite targets by the shooters in the area around campsites 50 through 60, and/or warning Beaudette and plaintiffs of the known dangers posed by the shooter. Defendants' failure to do anything created a reasonably foreseeable risk that Beaudette and plaintiffs would be injured by the shooter. "By doing nothing in response to at least seven to nine prior shootings," State defendants maintained the property in such a way so as to increase the risk of criminal activity by this shooter and expose [Beaudette and plaintiffs] to foreseeable harm." This cause of action also invoked Government Code sections 815.2, 815.6 and 820 as a statutory basis for State defendants' liability for injury caused by their employees' acts and omissions.

As an alternate ground for negligence liability, plaintiffs allege the State employees directed Beaudette and his daughters to campsite No. 49, very close to where earlier shootings had taken place, and then re-directed Beaudette to campsite No. 51, a location even closer to where those earlier shootings had occurred, without telling him of the risks they were encountering in that campsite, even though the State employees knew of the risk associated with camping in the area. Neither did the State employees prevent access to the campsite to which they directed Beaudette and his daughters. Nor did the State defendants adequately train and supervise their managerial employees, rangers, peace officers, other employees, agents and volunteers in the control and direction of warning procedures.

The TAC alleges that had Beaudette been warned of the risk, he would have declined to stay at the park to avoid exposing himself and his young children to the risk. Alternatively, if the State employees had prevented access to the areas of Malibu Creek State Park in the zone of danger created by the known shooter, Beaudette would not have been killed.

B.    Wrongful Death/Negligence Against County Defendants

The third cause of action for negligence/wrongful death is against the County defendants. This cause of action alleges the County defendants were all aware of least seven to nine unsolved gunshot shootings of humans and vehicles between November 2016 and June 22, 2018. They owed a duty of care to overnight campers and the public not to conceal from the public their knowledge that there was a serial shooter terrorizing Malibu Creek State Park, and to warn the public and overnight campers of the series of shootings and the foreseeable danger at the state

11

park. Instead, they intentionally concealed that prior shootings had occurred in and adjacent to the campsite and then negligently and carelessly allowed Beaudette to camp there without such warnings and then to be shot while asleep in his tent with this children next to him.

Further, the County defendants knew that publicity about specific criminal activity in a specific locale acts as a deterrent to criminals, causes the law-abiding public in those areas to be more vigilant, watchful and observant of suspicious behavior, scares the criminal element from re-committing such crimes or causes them to move off to another less publicized area, and would have acted as a deterrent to camping in such a dangerous locale. The County defendants willfully or maliciously disregarded the safety of campsite patrons by failing to warn of the known perils of the shootings. As a result, Beaudette in ignorance camped with his children and was killed.

Alternatively, the County defendants agreed to cross-report information to the State defendants to facilitate responding to the shootings, yet failed to timely and accurately report the prior related shootings, including the vehicular shootings adjacent to the park on June 8, 2017, July 22, 2017 and June 18, 2018. Had the County defendants performed their agreed-upon reporting obligation, the State defendants, who relied on the cross-reporting, would have taken appropriate measures to protect patrons. The special relationship between the State defendants and County defendants as to their cross-reporting agreement imposed upon the County defendants a duty to take reasonable steps to protect Beaudette and warn of foreseeable danger posed to them at the campsite.

Plaintiffs allege statutory duties under Government Code sections 815.2, subd. (a), 815.6 and 820, subd. (a), that is, public employees have a statutory duty and are statutorily liable for injury caused by their acts or omissions to the same extent as a private person as provided by Government Code sections 820, subd. (a) and 815.2, subd. (a). Further, under Government Code section 815.6, the County defendants were liable for failing to discharge their mandatory duty to protect Beaudette. The burden to warn paying campers of the danger was "minuscule" compared to the great harm of failing to do so.

C.     Negligent Infliction of Emotional Distress/Bystander Against All Defendants

The fourth cause of action alleges plaintiff daughters witnessed the killing of their father and have suffered immeasurably severe emotional distress under *Dillon v. Legg* (1968) 62 Cal.2d 728. Plaintiffs seek to hold all defendants liable under Government Code sections 815.2, 815.6 and 820.

III.   **The Order Sustaining the Demurrers to the Third Amended Complaint**

A.     The County Defendants

The County defendants demurred to the third (wrongful death—negligence) and fourth (negligent infliction of emotional distress—bystander) causes of action in the Third Amended Complaint.

The trial court sustained the demurrer of the County defendants without leave to amend. In a meticulously detailed opinion, the trial court concluded that the County defendants, sued in their capacity as law enforcement agencies and agents, had no duty to warn plaintiffs of the dangers posed by third

13

parties where the County defendants were not in a special relationship with plaintiffs, as they might had been if they had, for example, made an explicit promise to Beaudette and his daughters that lulled them into a false sense of security. As the trial court stated: "[T]he County defendants' argument that there was no duty to warn is dispositive."

B.     The State Defendants

The State defendants demurred to the first (wrongful death—negligence) and fourth (negligent infliction of emotional distress—bystander) causes of action in the Third Amended Complaint. The trial court sustained the demurrer of the State defendants with leave to amend.

As to the first and fourth causes of action, plaintiffs argued that State employees directed Beaudette and his daughters specifically to Campsite No. 51, knowing it was in the "zone of danger" and without telling them about the active shooter. The trial court sustained the demurrer on this point with leave to amend to allow plaintiffs to further develop the notion that the state employees' actions constituted misfeasance. The trial court stated in the order: "At the hearing, plaintiffs indicated that they could allege that the State defendants' employees' actions constituted misfeasance. Specifically, plaintiffs stated that they could and would allege the following: (1) the physical relationship between the in-park shootings to Campsite No. 51, as well as the physical relationship between a shooting just outside the park days before Beaudette was shot; and (2) the particular State employee who assigned Beaudette to Campsite No. 51 (and perhaps No. 49) personally believed that it was dangerous and the employees would not go there at night specifically because there was an active shooter at that time. Based on these

14

statements, the [c]ourt granted leave to amend on this specific point, subject to additional restrictions . . . . The [c]ourt emphasizes it is not saying these new allegations will pass muster."

Nevertheless, the trial court found that the State defendants did not have a special relationship with Beaudette and his daughters and therefore had no duty to warn them. The trial court sustained the demurrer as to the first and fourth causes of action on the ground that plaintiffs failed to allege a duty. The only basis upon which the trial court granted plaintiffs leave to amend was to allege misfeasance.[1] On November 29, 2021, plaintiffs filed a Fourth Amended Complaint as to the State defendants only.

IV.    **The Fourth Amended Complaint**

In the Fourth Amended Complaint, plaintiffs added allegations: Beaudette reserved campsite No. 49 but after arriving at the park, he requested that his campsite be moved. The State employees moved him and his daughters to campsite No. 51 without telling them of a series of prior incidents (of which the employees were aware) concerning a serial shooter that took place approximately 100 feet from campsite No. 51, at campsite

---

[1]    We note our Supreme Court has disapproved the use of the terminology "misfeasance" and "nonfeasance" in analyzing duty. " 'The proper question is not whether an actor's failure to exercise reasonable care entails the commission or omission of a specific act.' (Rest. 3d Torts, [Liability for Physical and Emotional Harm (2012)] § 37, com. c, p. 3.) Rather, it is 'whether the actor's entire conduct created a risk of harm.' (*Ibid.*)" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204 at p. 215, fn. 6. (*Brown*).)

Nos. 57 and 58. Two of the prior shootings were approximately 135 to 150 feet from campsites 49 and 51. The State employees, supervisors, and managerial staff had allegedly discussed these dangers with each other before and after the June 18, 2018 shooting of the Tesla and just before the shooting that killed Beaudette on June 22, 2018. Consequently, the State employees and agents were advised before and after the June 18, 2018 shooting and before Beaudette was shot on June 22, 2018 by managerial staff and supervisors at Malibu Creek State Park not to go alone to places within the park and not to go at night into the park, including the campground area where Beaudette was shot. "Despite the fact that these State Employees would not go to that area, including campsites Nos. 49 and 51, alone or at night because of the prior shootings, and had been warned not to do so by STATE DEFENDANTS' supervisors and managerial staff, those State employees sent TRISTAN BEAUDETTE and his daughters to the very place they were afraid to go and would not go because of the shooter lurking in that zone of danger." In the meantime the State employees continued to sell patrons campsites for the purpose of sleeping outdoors and unprotected without warning of the potential and likely danger posed by the serial shooter. The State employees provided plaintiffs with a false sense of security while they slept outdoors exposed to the conditions. The State employees affirmatively placed Beaudette in harm's way, lulling him into believing that he was not subjecting himself and his children to risk of harm beyond what was ordinarily associated with camping.

The trial court found that these allegations were predicated on a "zone of danger" theory. The court believed that phrase is shorthand for whether the June 22, 2018 shooting was a "foreseeable risk." The trial court found that it "is not required to accept the legal conclusion that there was a 'zone of danger' (i.e., foreseeable risk of shooting) around Campsite Nos. 49 and 51." The court ruled it "cannot reasonably infer that there was a foreseeable risk that Beaudette would be shot at Campsite Nos. 49 and 51 at the time he arrived such that the State defendants placed him in the 'zone of danger.' Whether speaking in geographic or temporal terms, the prior events do not create the purported risk plaintiffs conclude existed at Campsite Nos. 49 and 51. The State defendants had no reason to believe that directing Beaudette to those campsites would place him in a dangerous position and create a serious risk of harm." The trial court concluded that "[n]either the campsites in question nor the park in general was in the "zone of danger" and therefore there was no alleged misfeasance by the State defendants.

The trial court reiterated its previous rulings that no special relationship existed between the State defendants and Beaudette and his daughters and therefore the State defendants owed no duty to them.

On March 10, 2022 the trial court filed its order and judgment sustaining the demurrer of the State defendants without leave to amend. On March 8, 2022, a judgment of dismissal was filed as to the County defendants. This appeal followed.

## DISCUSSION

I. **Governing Principles**

A. <u>Demurrer and Standard of Review</u>

"A demurrer tests the legal sufficiency of the factual allegations in a complaint.  We independently review the superior court's ruling on a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense.  [Citations.]  We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken.  [Citations.]  We liberally construe the pleading with a view to substantial justice between the parties [citations]; but, '[u]nder the doctrine of truthful pleading, the courts "will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to that which are judicially noticed." ' " (*Ivanoff v. Bank of America, N.A.* (2017) 9 Cal.App.5th 719, 725–726.)

"On appeal from a judgment of dismissal entered after a demurrer has been sustained without leave to amend, unless failure to grant leave to amend was an abuse of discretion, the appellate court must affirm the judgment if it is correct on any theory." (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742.)  The burden is on the plaintiff, however, to demonstrate the manner in which the complaint might be amended.  (*Ibid.*)  Here, plaintiffs propose no new factual allegations.  Accordingly, they have waived any claim that the trial court abused its discretion in failing to grant leave to amend.

B.   Negligence and Standard of Review

In its seminal ruling in *Brown*, our Supreme Court clarified "how courts should decide whether a defendant has a legal duty to take action to protect the plaintiff from injuries caused by a third party." (*Brown*, *supra,* 11 Cal.5th at p. 209.)  "To state a cause of action for negligence, a plaintiff must establish the defendant owed a legal duty of care.  Generally speaking, all persons have a duty to take reasonable care in their activities to avoid causing injury, though particular policy considerations may weigh in favor of limiting that duty in certain circumstances." (*Ibid.*)  The *Brown* Court set out a two-step inquiry.  "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect.  Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108] to determine whether relevant policy considerations counsel limiting that duty." (*Ibid.*)

In addition to stating a legal duty to use due care, a plaintiff must show breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.  (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083.)  The existence of a duty is a question of law, which we review de novo.  (*Ibid.; Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 620 (*Regents*) [determination whether a particular relationship supports a duty of care rests on policy and is a question of law].)

II.   **The County Defendants Owed No Duty to Plaintiffs.**

In the TAC plaintiffs sue the County defendants in their capacities as law enforcement agencies and law enforcement

19

officials.  In the trial court, plaintiffs proffered two theories as to why the County defendants are liable for Beaudette's death.  First, they contended the County owed a duty of care to warn campers, including plaintiffs, of the shootings near and around Malibu Creek State Park, a duty they negligently failed to perform.  Second, they contended that by agreeing in 2017 to "cross-report" any shootings outside the park to the State defendants, the County defendants undertook a separate duty towards the plaintiffs, a duty they then negligently breached.  Put another way, plaintiffs' theory in this regard is that if the County defendants had kept their promise and cross-reported the three shootings that occurred after January 2017, Beaudette would not have been killed.

On appeal, plaintiffs have not briefed their contention that the County defendants, as law enforcement, had a duty to warn plaintiffs of the shootings near and outside Malibu Creek State Park.  Because it has not been briefed, we deem it waived.  (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134.)  The only ground left supporting their negligence/wrongful death claims is the contention that when the County defendants undertook the obligation to "cross-report" shootings near and outside the park to the State defendants, and then failed to do so, they created and then breached a duty of care to plaintiffs.

The general duty to exercise due care for the safety of others is broad, but it has limits.  A defendant is generally not liable for failing to protect another from a peril the defendant did not create.  (*Brown, supra*, 11 Cal.5th at p. 214.)  As a general rule a legal duty of care applies only when it is the defendant who has created a risk of harm to the plaintiff, including when the defendant is responsible for making the plaintiff's position worse.

20

(*Ibid.*) The law does not impose a general duty to protect others from the conduct of third parties. (*Williams v. State of California* (1983) 34 Cal.3d 18, 23 (*Williams*) [no general "duty to come to the aid of another"].)

The "no-duty-to-protect" rule embodies the principle that "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." (*Davidson v. City of Westminister* (1982) 32 Cal.3d 197, 203.) Nevertheless, there are exceptions to the rule. One exception is where a person chooses to "undertake" to come to the aid of another. Another exception is where a special relationship exists between the parties or the plaintiff and the third party or some other set of circumstances, giving rise to an affirmative duty to protect. (*Brown, supra,* 11 Cal.5th at p. 215.)

Here plaintiffs argue the County defendants owed a duty of care because they agreed to cross-report shootings outside the Malibu Creek State Park to the State defendants; and when they did not cross-report as promised, they increased the danger to plaintiffs of being shot. This contention plainly implicates the negligent undertaking exception to the "no-duty-to-protect" rule. (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235, fn. 12.) Under this doctrine, "one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558–559.)

However, "the scope of any duty assumed depends upon the nature of the undertaking." (*Delgado v. Trax Bar & Grill, supra,* 36 Cal.4th at p. 249.) Here, undertaking the duty to "cross-report" to the State defendants did not create a duty of care to

21

these specific plaintiffs. The TAC does not allege facts showing that the County defendants assumed a responsibility towards particular individuals that was distinct from their duty to protect the citizenry at large. Indeed, the allegation describes no more than law enforcement's duty to protect the general public as a whole. (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 799.)

Nor did the failure to "cross-report" increase the harm to plaintiffs. It is conjecture to allege the State defendants' response to the series of shootings depended upon information it received or did not receive from the County defendants about shootings near and outside Malibu Creek State Park. The State defendants did not even respond to shootings within the park; whether they would have responded to additional shootings outside the park is speculation unsupported by factual allegations. Moreover, the operative complaints allege the State defendants were aware of the other shootings long before Beaudette was killed. And, as the trial court noted, the County defendants' failure to cross-report as agreed was an effort to alleviate the risk posed by the shootings. Their failure to cross-report did not increase the harm.

We conclude the County defendants, as law enforcement agents, owed no duty to plaintiffs separate and apart from the duty they owe to the general public at large, a duty which, in and of itself, cannot form the basis of negligence liability. (*Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 291–292 [cause of action for negligence does not encompass law enforcement's duty of care to the public at large].) No special relationship with plaintiffs or increase of harm resulted by virtue of their agreement and then failure to cross-report other shootings. The

22

trial court properly sustained the demurrer without leave to amend.[2]

## III. **The State Defendants Owed a Duty to Warn of the Shootings.**

The trial court concluded neither the State defendants nor any employee of the State defendants owed a duty to warn Beaudette of the danger he was exposed to at the campsite at which they assigned him to sleep. Plaintiffs contend the trial court erred in finding no duty. We agree.

The no-duty-to-protect rule yields, as set forth above, to special relationships. In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim from another's harm if that person is in what the law calls a "special relationship" with either the victim or the person who created the harm. (*Brown, supra*, 11 Cal.5th at p. 215.) A "duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection." (*Regents, supra*, 4 Cal.5th at p. 619.)

In *Regents*, our Supreme Court considered the "common features" of a special relationship. The *Regents* court observed that "[g]enerally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." (*Regents, supra*, 4 Cal.5th at p. 620.) Further, "[t]he corollary of

---

[2]     Because we find no duty of care under the doctrine of negligent undertaking as to the County defendants, we need not reach issues of statutory immunity. (*Williams, supra*, 34 Cal.3d at p. 22 [applicability of statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff.].)

dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." ' " (*Id*. at p. 621.) In addition, "[s]pecial relationships also have defined boundaries. They create a duty of care owed to a limited community, not the public at large." (*Ibid*.) Finally, the court noted that "although relationships often have advantages for both participants, many special relationships especially benefit the party charged with a duty of care," mentioning retail stores and hotels as examples. (*Ibid*.)

Here, campers who pay a fee to sleep overnight in tents at a state park are dependent on the state park for their security. This is especially so while they are asleep. Generally speaking, state park campers are not at the park on daily basis over a period of time. They are in and out of the state park for their camping experiences. The state park employees, on the other hand, are familiar with the daily operation of the park and, as the operative complaint alleges, operate, maintain, repair, control, and patrol the state park. The park itself has its own state park police force to patrol and secure the premises. The state park employees have superior knowledge about happenings in and around the park. It is they who assign campsites to patrons, who cannot otherwise camp in the park without paying a fee for a particular location to which they are assigned. The state park employees alone enforce the park's rules and regulations. Campers entrust their safety to park police, certainly with the expectation that the park police will at the very least advise them

24

of security concerns ongoing during their camping experience. While state employees cannot conclusively control third parties with criminal intent, they can warn campers of dangers of which they become aware during the course of their employment, and of which itinerant campers will not necessarily be cognizant. Similar to duties placed upon innkeepers, bar owners, and property owners, the duty to warn overnight campers of a series of nighttime serial shootings is properly placed on the party with superior information, superior control over the environment, and superior ability to monitor the situation. In this case that would be the State defendants.

Alternatively, we conclude "other circumstances," in addition to and distinct from the special relationship between the State defendants and their overnight campers, warrant imposing on the State defendants a duty to warn. Where, as alleged here, State employees had concluded that the nighttime shootings were deliberately directed at Malibu Creek State Park and no other property, and where, as alleged here, Malibu Creek State Park managerial staff had warned their own employees not to go to that area of the park at night or alone, a duty to warn overnight campers of the series of shootings is warranted.

How extensive is the duty to warn that we impose, whether due to a special relationship or other circumstances? We hold that the point at which the State defendants determine their own employees' safety is at risk is also the point at which they have a duty to warn campers that their safety is at risk as well.

Having imposed a duty to warn, the court may still "depart from the general rule of duty . . . if other policy considerations clearly require an exception." (*Regents, supra*, 4 Cal.5th at p. 628.) The second step of the analysis is to determine whether

25

the *Rowland* factors justify excusing or limiting a defendant's duty of care. (*Ibid; Doe v. Superior Court* (2015) 237 Cal.App.4th 239, 245 [a special relationship must satisfy policy considerations to obligate a defendant to act proactively as to possible future harm from a third party].)

Under *Rowland v. Christian*, a court must determine whether policy considerations require abrogation of the duty to warn we have just imposed. Those considerations include:

- foreseeability of harm to the plaintiff;
- the degree of certainty that the plaintiff suffered injury;
- the closeness of the connection between the defendant's conduct and the injury suffered;
- the moral blame attached to the defendant's conduct;
- the policy of preventing future harm;
- the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and
- the availability, cost, and prevalence of insurance for the risk involved. (*Rowland v. Christian, supra*, 69 Cal.3d. at p. 113)

Here the trial court did not proceed to the second step because it found no duty. We therefore remand the matter to the trial court to conduct a *Rowland* analysis in the first instance.

## DISPOSITION

The judgment is affirmed as to the County defendants and reversed as to the State defendants with directions to conduct a policy consideration analysis under *Rowland v. Christian.* Appellants are awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

VIRAMONTES, J.