Filed 6/24/26  Doe v. Nell CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ELLA DOE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JAMES NELL, SR.,<br><br>        Defendant and Respondent. | A171741<br><br>(San Mateo County<br>Super. Ct. No. 21-CIV-05499) |

Ella Doe sued James Nell, Sr. (Jim Sr.), for negligence based on her assertion that Jim Sr.'s son, James Nell, Jr. (Jimmy), sexually assaulted Doe twice in 2020, when Jimmy was an adult.[1]  The trial court granted Jim Sr.'s motion for summary judgment (MSJ) on the basis that Jim Sr. did not owe a legal duty to prevent the assaults and the negligence claim thus failed as a matter of law.  We affirm.

---

[1] Doe also sued Jimmy's mother, Susan Nell (Susan), and grandmother, Dorothea Nell (Dorothea), for negligence, and sued Jimmy for sexual battery. Only the claim against Jim Sr. is at issue in this appeal.

For ease of comprehension and meaning no disrespect, we refer to the defendants by their first names throughout this opinion.

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case centers on Doe's claim that she was sexually assaulted by Jimmy on July 1, 2020, and July 14, 2020, at which time Doe was 13 years old and Jimmy was 19 years old.

Doe's mother, Dolores Doe (Dolores), and Jimmy's mother, Susan, were childhood friends, and their families saw each other occasionally until around 2015.

Susan and Jimmy's father, Jim Sr., separated in 2018 and were later divorced. Susan moved to a farm (the farm) in 2019. Jim Sr. lived on a separate, 6.25-acre property (the property) owned by his mother, Dorothea. Dorothea lived in the main house on the property and Jim Sr. lived in a separate alternative dwelling unit (ADU) about 100 feet from the main house. There was a pool on the property near the back of Dorothea's house.

At all times relevant to this case, Jimmy split his time between his parents, staying some of the time on the farm with Susan and some of the time at the property with Jim Sr., though the record is not clear as to how much time was spent at either location. Jimmy had his own car and drove himself between his parents' houses. Jim Sr. did not restrict what Jimmy did or who he saw. Jim Sr. and Susan provided some financial support to Jimmy to help with tuition expenses, and Jimmy did not pay rent to either of his parents.

Unless otherwise noted, all further dates refer to 2020.

*Memorial Day Events at the Farm*

Susan invited Dolores and her family to visit the farm for Memorial Day weekend. Dolores brought her children, including Doe. Jimmy was also present, but Jim Sr. was not there.

2

While at the farm over Memorial Day weekend, Jimmy and Doe spent a lot of time riding dirt bikes[2] together. Susan observed that Doe appeared to like Jimmy as Doe was very clingy towards him, wrapping her legs and hands around him on the bike and touching his arms and back. This caused Susan to have a talk with Jimmy, telling him to be "observant" as Doe was young.

*Swimming Events*

On May 27, a few days after the Memorial Day weekend, Jimmy picked up Doe and Doe's sister and brought them to the property to go swimming in the pool behind Dorothea's house (May swimming event). Jim Sr. was present and went swimming with Jimmy and Doe. This was the only time Jim Sr. saw Doe at the property, and he did not see or interact with her at any time following the May swimming event.

After the May swimming event, Dolores recalled Susan telling her that Dorothea had told Susan and Jim Sr. that Doe was "jailbait." Susan told Dolores that Susan was going to ask Jim Sr. to talk with Jimmy about Doe. Dolores herself never talked to Jim Sr. about any suspicion regarding Doe and Jimmy. Around that same time, Susan asked Jim Sr. to talk with Jimmy to "advise him not to get involved with" Doe and remind him Doe was only 13 years old.

In early June, Jim Sr. was informed by Dorothea that Doe had been at the property the day before swimming in the pool with Jimmy (June swimming event). Dorothea told Jim Sr. that Doe had " 'hot pants.' "

About two months after being asked by Susan to talk to Jimmy following the May swimming event, Jim Sr. had a conversation with Jimmy

---

[2] The record variably refers to the dirt bikes as motorcycles or all-terrain vehicles.

3

and told him not to become involved with Doe.[3]  In response, Jimmy told Jim Sr. he did not have any sexual desire toward Doe and there was no relationship between them.

*July Assaults*

Doe alleged she was sexually assaulted by Jimmy on July 1 (July 1 assault) and July 14 (July 14 assault).

As to the July 1 assault, Doe asserted as follows.  Jimmy told her over the phone he was going to pick her up from her home.  Jimmy brought Doe to the property so they could go swimming.  Before swimming, Jimmy took Doe to his bedroom, where Doe observed condoms next to his bed; Jimmy told Doe his parents had given him the condoms.  Later that day, Jimmy took Doe to a room inside Dorothea's house and sexually assaulted Doe while wearing a condom.  Doe had never been inside Dorothea's home prior to July 1.

As to the July 14 assault, Doe alleged Jimmy sexually assaulted her while they were at her mother's (Dolores's) house by putting his fingers into her vagina.

Doe did not recall if Jim Sr. was home during the July 1 assault.  There was no allegation that Jim Sr. was present at Dolores's home during the July 14 assault.

*Doe's Complaint*

In October 2021, Doe filed the complaint underlying this appeal.  The sole cause of action against Jim Sr. was for negligence.  Doe alleged Jim Sr. had a special relationship with Jimmy and, as a result, owed a duty to control Jimmy against any inappropriate sexual conduct with Doe.  She asserted it

---

[3] The record alternatively indicates the conversation may have happened only days later, but we presume it was two months later viewing the evidence in the light most favorable to Doe.

4

was foreseeable to Jim Sr. that Jimmy "desired sexual relations" with Doe on the bases that: Jim Sr. "was aware that [Jimmy] showed sexual attention to [Doe]; he was aware that his son had a proclivity for sexually harassing female students at his high school and that his son had been suspended for making gun-related threats; . . . [he] knew that [Jimmy] brought girls to his room at [Jim Sr.'s] house and he had in fact supplied his son with condoms for use on those and other occasions; he was aware that [Doe] was underage; . . . [and he] knew of his son's sexual design on [Doe] as expressed by" Susan.

Jim Sr. filed an answer denying the allegations and raising various defenses, including that he had no prior knowledge of any assaultive propensities of Jimmy and that the alleged assaults were proximately caused by acts and omissions of others not under his control.

*MSJ and Opposition*

In March 2024, Jim Sr. filed the operative MSJ.[4]  Jim Sr. asserted the negligence claim failed as a matter of law on the basis that there was no triable issue of fact that he owed a duty to control Jimmy's conduct or prevent Jimmy from sexually assaulting Doe.  He contended he did not have the ability to control Jimmy's conduct and there was no special relationship between them as Jimmy was an adult.  Jim Sr. further argued the factors enumerated in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) weighed against imposing a duty of care on Jim Sr. to control Jimmy, particularly on the ground that it was not foreseeable to him that Jimmy would sexually assault Doe prior to the incidents.

In support of the MSJ, Jim Sr. submitted a declaration and deposition testimony stating as follows.

---

[4] Jim Sr.'s first MSJ was denied without prejudice.  All references to the MSJ in this opinion are to the operative, second MSJ.

5

During the May swimming event, Jim Sr. did not observe any behavior by Jimmy that made him believe Jimmy was sexually attracted to Doe. Jim Sr. did not believe Susan asked him to talk to Jimmy following the May swimming event out of any concern that *Jimmy* was sexually interested in Doe. Rather, Susan told Jim Sr. she thought *Doe* was being "aggressively clingy" toward Jimmy when they were riding the dirt bikes at the farm.

When Dorothea told Jim Sr. that Doe had " 'hot pants' " following the June swimming event, Jim Sr. understood that to mean Dorothea thought Doe was behaving in a way that was more sexual than Dorothea was comfortable with, and that Dorothea found inappropriate. Jim Sr. did not take it to mean that Jimmy was behaving inappropriately.

As to the July 1 assault, Jim Sr. did not see Doe on July 1 or know she had been at the property that day. Jim Sr. did not invite Doe to, or give permission for Doe to come to, the property that day. Jim Sr. was not at his ADU or Dorothea's house while Doe was at the property that day. Rather, he was on another part of the property, out of sight of both houses, doing landscaping work with powered equipment while wearing hearing protection.

As to the July 14 assault, Jim Sr. was not present at Dolores's home and he did not have any knowledge of anything Jimmy did there on that day.

Jim Sr. first learned of Jimmy's conduct regarding the July 1 and July 14 assaults in September, after Jimmy was arrested. Prior to the assaults, Jim Sr. was unaware of behavior by Jimmy suggesting he was sexually interested in Doe or that was otherwise sexually inappropriate.

In either 2018 or 2019, when Jimmy was a minor, Jim Sr. gave Jimmy a package of condoms after learning that Jimmy had started dating. Jim Sr. did so as a preventative measure for Jimmy to have protection if he were to have sex.

6

Doe opposed the MSJ.  She argued there was a triable issue of fact as to whether a special relationship existed placing a duty on Jim Sr. to protect others from Jimmy on the basis that Jim Sr. had the ability to control Jimmy's conduct.  In support, Doe argued Jimmy primarily lived with Jim Sr. and only lived with Susan some of the time; Jimmy was in college and did not have a job; Jim Sr. and Susan paid for Jimmy's tuition; and Jim Sr. testified in his deposition that Jimmy respected his authority.

Doe further argued the *Rowland* factors supported imposing a duty on Jim Sr.  She asserted it was foreseeable that there "was a danger of a sexual relationship" between Jimmy and Doe given Susan's warning to Jim Sr. to talk to Jimmy after the May swimming event and Dorothea's comment that Doe was " 'jailbait.' "  She argued Jim Sr.'s knowledge was proximate to the harm caused by the sexual assaults, including the emotional harm she experienced, going in and out of hospitals and treatment facilities, having suicidal thoughts, attempting suicide, and developing an eating disorder.  As to the remaining factors, Doe contended moral blame is attached to Jim Sr.'s conduct, there is a strong policy of preventing such harm "for the good of all children," there is no burden on Jim Sr. and no consequences to the community for imposing such a duty, and homeowners insurance could cover the risk involved.

*Trial Court's Ruling*

In July 2024, following a hearing the prior month, the trial court granted the MSJ.  The court stated it did not need to decide whether there was a special relationship because—even assuming Jim Sr. had sufficient control over Jimmy to establish a special relationship between them—the sexual assaults were not sufficiently foreseeable to support a finding that Jim Sr. had a legal duty to prevent the assaults or protect Doe.  The court

7

considered the *Rowland* factors and found they did not support a different result, primarily due to the lack of foreseeability, finding there was no evidence prior to the assaults that Jim Sr. knew or had reason to believe Jimmy had ever engaged in sexually inappropriate conduct or intended to do so.  As Jim Sr. had no duty to prevent the assaults, the negligence claim failed.  The court subsequently entered judgment in favor of Jim Sr.  Doe appealed.

## DISCUSSION

## I. Standard of Review and Applicable Legal Principles

Summary judgment is appropriate where there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law, viewing the evidence in the light most favorable to the nonmoving party. (*Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)  We review a grant of summary judgment de novo, independently determining whether the record supports the trial court's conclusion that the asserted claim fails as a matter of law.  (*Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1166.)  We are not bound by the reasons set forth in the trial court's order, nor its rationale.  (*Ibid*.)

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.]  Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).)

In general, the law does not impose a duty on an individual to act to protect others from the conduct of third parties where the individual does not contribute to the risk that others would suffer from any alleged harm.

8

(*Brown, supra*, 11 Cal.5th at p. 214.)  "This general rule . . . 'derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter.' " (*Ibid.*)

There are, however, exceptions to the "no-duty-to-protect rule," in which "a defendant may have an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." (*Brown, supra*, 11 Cal.5th at p. 215.)  One such exception relevant for our purposes is that "a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Ibid.*)

A special relationship between the defendant and a third party who created the harm "is one that 'entails an ability to control [the third party's] conduct,' " which puts the defendant in a unique position to protect the plaintiff from injury. (*Brown, supra*, 11 Cal.5th at p. 216.)  Among the types of relationships that give rise to an affirmative duty to protect are those between parents and dependent children.  (*K.G. v. S.B.* (2020) 46 Cal.App.5th 625, 630–631 (*K.G.*).)  In the absence of either a special relationship or conduct by a defendant that increases the risk of injury to a plaintiff, the defendant owes no legal duty to the plaintiff. (*Brown*, at p. 216.)

With these legal principles in mind, we turn to whether Doe's claim of negligence fails as a matter of law based on the threshold question of whether Jim Sr. had a legal duty of care to protect Doe from Jimmy's conduct, which she premised on the basis that Jim Sr. had a special relationship with Jimmy.  We conclude no such duty of care existed.

9

## II. Doe's Negligence Claim Fails as a Matter of Law

In *Brown*, the California Supreme Court clarified that a two-step inquiry governs whether to recognize a legal duty of care. (*Brown*, *supra*, 11 Cal.5th at p. 209.) "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty." (*Ibid*.)

### A. The Court's Failure To Follow the *Brown* Two-step Inquiry Is Not Dispositive

Doe avers the trial court erred by failing to follow this two-step inquiry, instead granting the MSJ based solely on its analysis of foreseeability and the other *Rowland* factors. She further contends that, under a proper application of the two-step inquiry, Jim Sr. owed a duty to protect Doe.

Although we find the court should have followed the two-step inquiry laid out in *Brown*, we are not limited by the court's rationale in granting the MSJ. (*Miller v. Pacific Gas & Electric Co.*, *supra*, 97 Cal.App.5th at p. 1166.) Reviewing the summary judgment ruling under the framework set forth in *Brown*, we conclude the court correctly found Doe's negligence claim failed as a matter of law as Jim Sr. owed no duty of care to protect Doe.

### B. No Special Relationship Gave Rise to an Affirmative Duty on Jim Sr.'s Part To Protect Doe

Doe argues a special relationship existed between Jim Sr. and Jimmy at the time of the sexual assaults, giving rise to an affirmative duty to protect her from Jimmy's conduct. Specifically, she asserts a reasonable trier of fact could find Jimmy to be a "dependent child" of Jim Sr. at the time of the assaults, even though Jimmy was then 19 years old. Doe further asserts Jim

Sr. must have known Jimmy had a propensity toward having sexual relations with Doe and, therefore, he had actual knowledge of danger to Doe. We are not convinced.

The "key issue" and a " 'basic requisite' " for a special relationship is whether the defendant could control the other person's conduct. (*K.G.*, *supra*, 46 Cal.App.5th at p. 631 [" '[I]n order for one to "take charge" of a person such that a legal duty to control his or her conduct is created, one must possess the *ability* to control.' "].) When the ability to control the other person does not exist, courts have routinely held no duty arises, including in the parent/dependent child context. (See *ibid.* [collecting cases].)

A comment to the Restatement Third of Torts explains: "[T]he 'basis of the parents' duty with regard to dependent children is the parents' responsibility for child-rearing, their control over their children, and the incapacity of some children to understand, appreciate, or engage in appropriate conduct.' [Citation.] The comment recognizes the parental duty of care changes as children reach adolescence and gain independence and concludes, 'When children reach majority or are no longer dependent, parents no longer have control, and the duty no longer exists.' " (*K.G.*, *supra*, 46 Cal.App.5th at p. 631, quoting Rest.3d Torts, Liability for Physical and Emotional Harm, § 41, com. d.)

In *K.G.*, the appellate court concluded no special relationship existed between a father and his adult son, even though the son was financially dependent on the father, as there was no evidence the father had the ability to control the son's conduct. (*K.G.*, *supra*, 46 Cal.App.5th at p. 632.) The court rejected the plaintiff's assertion that the special relationship existed because the father provided the son an apartment, money, and a car to drive,

11

reasoning the son made his own choices about how to use those resources. (*Ibid.*)

Similarly, here, there is no evidence showing Jim Sr. had the ability to control Jimmy's conduct at the time of the assaults such that a special relationship could be deemed to exist between them on a parent/dependent child basis. Jimmy was 19 years old, had his own car, and came and went from the property as he pleased. Further, Jim Sr. did not restrict Jimmy's actions or who Jimmy saw. In the absence of evidence that Jim Sr. was able to control Jimmy, there is no basis for imposing a legal duty on Jim Sr. to protect Doe from Jimmy's conduct. (See *K.G.*, *supra*, 46 Cal.App.5th at pp. 631–632 [" 'The absence of an ability to control is fatal to a claim of legal responsibility.' "].)

In arguing to the contrary, Doe asserts Jimmy "was still in the process of gaining his independence in life" and was still dependent on Jim Sr. since Jimmy lived with Jim Sr. and relied on him for housing, financial support, tuition, and other expenses. However, financial support from a parent to an adult child is insufficient to establish a special relationship, at least where, as here, there is no evidence showing Jim Sr. controlled Jimmy's decisions about how to use that financial support or otherwise had the ability to control Jimmy. (See *K.G.*, *supra*, 46 Cal.App.5th at p. 632.)

Doe further argues Susan would not have asked Jim Sr. to talk to Jimmy about Doe if he could not control Jimmy, and that Jim Sr. was "able to influence [Jimmy to] use condoms in any sexual activities." Not so. That Susan asked Jim Sr. to talk to Jimmy, and that Jim Sr. had previously given

12

Jimmy condoms, does not show any actual ability by Jim Sr. to control his adult child.[5]

Doe also points to various other evidence in the record to support her claim that Jimmy was dependent on Jim Sr., such as testimony that Jim Sr. "knew that [Jimmy] had issues with responsibility," "sometimes failed to realize the difficult situations [Jimmy] put himself in," and "had difficulty thinking through solutions before making decisions," and that Jimmy respected Jim Sr.'s authority. We decline to find these vague, nebulous statements provide any evidence of Jim Sr.'s ability to control Jimmy.

Finally, to the extent Doe asserts Jim Sr. had a duty because she was a foreseeable victim of Jimmy's conduct, the evidence provided does not support this conclusion. (See, e.g., *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 ["A duty to control, warn, or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] . . . the foreseeable victim of that conduct.' "].) Doe's contention relies primarily on Susan's request to Jim Sr. to talk to Jimmy about Doe, Dorothea's statement to Jim Sr. and Susan that Doe was " 'jailbait,' " and Dorothea's statement to Jim Sr. that Doe had " 'hot pants' " after the June swimming event. Contrary to Doe's assertion, there is no indication from any of these statements that Jim Sr. had any actual knowledge that Jimmy would sexually assault her. And so, the evidence does not provide a basis for imposing a legal duty of care on Jim Sr.

In sum, the record does not support a finding that Jim Sr. had the ability to control Jimmy's conduct at the time of the sexual assaults or had

---

[5] Doe also references Jim Sr. helping to resolve a disciplinary incident when Jimmy was a freshman in high school, years before the sexual assaults, which is plainly irrelevant to the question of whether Jim Sr. could control Jimmy when he was 19 and out of high school.

actual knowledge that Jimmy would sexually assault Doe. Therefore, no special relationship existed giving rise to an affirmative duty on Jim Sr. to protect Doe. As there was no such relationship, we need not, and do not, reach the parties' arguments regarding the *Rowland* factors. (See *Brown*, *supra*, 11 Cal.5th at p. 222 [courts need not reach second step of *Brown* inquiry where no special relationship gives rise to a duty to protect].)

Accordingly, the court did not err in its ruling that Doe's negligence claim against Jim Sr. fails as a matter of law.

### DISPOSITION

The judgment is affirmed. Jim Sr. is awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


PETROU, J.

WE CONCUR:

TUCHER, P. J.

RODRÍGUEZ, J.


A171741 / *Doe v. Nell*

14